# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
January 28, 2021

Lyle W. Cayce
Clerk

No. 17-10665

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

WILBERT JAMES VEASEY, JR.; CHARITY ELEDA, R.N.; JACQUES ROY, M.D.; CYNTHIA STIGER,

*Defendants—Appellants*.

---

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:12-CR-54

---

Before GRAVES, COSTA, and ENGELHARDT, *Circuit Judges*.

PER CURIAM:[*]

This is a direct criminal appeal by four defendants convicted of multiple counts in a health care fraud case. On appeal, the defendants challenge their convictions and sentences. Finding no error, we AFFIRM

---

[*] Pursuant to 5TH CIRCUIT RULE 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIRCUIT RULE 47.5.4.

No. 17-10665

the judgments in the district court as to all four appellants for the reasons stated herein.

## FACTS AND PROCEDURAL HISTORY

Wilbert James Veasey, Jr. and Cynthia Stiger were the owners and registered directors of Apple of Your Eye Health Care Services, a home health care provider in Dallas. Charity Eleda operated Charry HHA. Dr. Jacques Roy operated a medical company called Medistat and was the certifying physician for various home health providers. All of these entities provided services to Medicare beneficiaries.

Medicare is a federal health care program for people who are over the age of 65 or disabled. Medicare has multiple parts and is administered by the United States Department of Health and Human Services (HHS) through the Center for Medicare & Medicaid Services.[1] Part A covers hospital insurance and includes home health services. Part B covers medical insurance. A health care provider must apply to Medicare and be assigned a National Provider Identifier (NPI) to be able to provide services to a Medicare beneficiary and bill Medicare. This requires the provider to follow certain laws, rules and regulations.

There are additional requirements for home health services under Medicare. To qualify for home health, a beneficiary must: essentially be confined to the home; under the care of a physician who certifies that the beneficiary is homebound; be receiving services under a plan of care established by and reviewed periodically by the physician; and need skilled nursing services, physical therapy or speech therapy on an intermittent basis,

---

[1] Medicaid is a state-run program for low-income individuals and children.

i.e., fewer than eight hours a day and seven days a week.[2] The standard form for a certification of need and plan of care (POC) is numbered 485. The physician who prescribes home health must sign the 485 POC before Medicare will pay the home health agency (HHA) in full. The POC must include various information including diagnoses, types of services, frequency of visits, prognosis, rehabilitation potential, functional limitations, activities permitted, medications, treatments, nutritional requirements, safety measures, discharge plans and goals. Physicians cannot prescribe services to an entity in which they have a financial interest.

Between 2004 and 2011, the number of HHAs in Dallas tripled. Federal authorities[3] began investigating Roy based on the large number of patients he certified for home health. At the time, Roy was first in the nation in certifying patients and more than double the next highest certifying physician. Roy was also receiving a large amount of payments from HHAs. The HHAs included those operated by Veasey, Stiger and Eleda.

Chelsie Drews, a special agent with the FBI and member of the strike force, testified that, pursuant to the investigation, officials conducted surveillance and interviewed beneficiaries. Through those interviews, authorities began to discover evidence of beneficiaries who did not appear to meet the requisite criteria for home health services. Investigators executed search warrants at various locations associated with the appellants and the relevant HHAs. As a result, authorities indicted several individuals,

---

[2] Skilled nursing is a service that must be provided by a registered nurse or a licensed vocational nurse under the supervision of a registered nurse and cannot be something that can safely be self-administered or performed by a non-medical person.

[3] Various agencies, including the FBI, HHS, Office of the Inspector General, Texas Attorney General's Medicaid Fraud Control Unit, and the U.S. Attorney's Office, created a health care fraud strike force.

including Roy, Stiger, Veasey, and Eleda, who are the individuals relevant to this appeal, for conspiracy to commit health care fraud and substantive counts of health care fraud.

In the multicount superseding indictment: Count 1 charged Roy, Veasey, Stiger and Eleda with conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349; Counts 2, 3 and 4 charged Roy and Veasey with health care fraud in violation of 18 U.S.C. § 1347; Counts 5, 6, 7 charged Roy with health care fraud; Counts 8, 9, 10, 11 charged Roy and Eleda with health care fraud; Counts 12-14 charged Eleda with false statements to Medicare in violation of 42 U.S.C. § 1320a-7b(a)(2); Counts 15 and 16 charged Roy with false statements relating to health care matters in violation of 18 U.S.C. § 1035; and Count 17 charged Roy with obstruction of justice in violation of 18 U.S.C. § 1505. Before trial, the court dismissed Count 5 on the government's motion.

Roy, Veasey, Stiger and Eleda were tried together. Roy was acquitted on Count 6, but the defendants were convicted on all remaining counts. Roy was sentenced to 120 months as to each of Counts 1-3, consecutively to each other; 120 months as to each of Counts 4 and 7-11, to run concurrently with each other and concurrently with Counts 1-3; and sixty months as to each of Counts 15-17, to run concurrently with each other, concurrently with Counts 4 and 7-11, and consecutively to Counts 1-3. Roy's total aggregate sentence was 420 months, along with six years of supervised release and various forfeitures. Pursuant to the Mandatory Victims Restitution Act of 1996 (MVRA), Roy was also ordered to pay restitution in the amount of $268,147,699.15, jointly and severally with Stiger, Veasey, Eleda and three other defendants who are not parties to this appeal. The restitution would be disbursed to the Centers for Medicare and Medicaid Services.

Stiger was sentenced to 120 months as to Count 1, three years of supervised release, and ordered to pay restitution in the amount of $23,630,777.26, jointly and severally with Roy and Veasey, to be disbursed to Medicare and Medicaid.

Veasey was sentenced to 120 months as to Count 1 and 90 months as to Counts 2, 3 and 4, to run concurrently to each other and consecutively to the term in Count 1. Veasey's total aggregate sentence was 210 months, along with two years of supervised release, and he was ordered to pay $23,630,777.26 in restitution, jointly and severally with Roy, Stiger, Eleda, and three other defendants not parties to this appeal.

Eleda was sentenced to 48 months each as to Counts 1, 8-11 and 12-14, to run concurrently, three years of supervised release and ordered to pay restitution in the amount of $397,294.51, jointly and severally with Roy.

Thereafter, the appellants filed this appeal.

## DISCUSSION

### I. Whether the district court abused its discretion when it refused to strike a juror based on perceived bias against the defense.

Roy, Veasey, Stiger and Eleda all assert that the district court abused its discretion when it refused to remove a juror that they argue demonstrated bias toward the defense.

A district court may dismiss a juror for "good cause" after trial has begun. Fed. R. Crim. P. 23(b)(2)(B). We review a district court's decision to dismiss a juror for abuse of discretion. *United States v. Pruett*, 681 F.3d 232, 247 (5th Cir. 2012) (per curiam). "A district court abuses its discretion only when its ruling is based on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *United States v. Ebron*, 683 F.3d 105, 126 (5th Cir. 2012). "A factual finding is not clearly erroneous as long as it

No. 17-10665

is plausible in light of the record as a whole." *Id*. at 126-27. "A district court's decision to remove a juror is discretionary whenever the judge becomes convinced that the juror's abilities to perform his duties become impaired." *United States v. Virgen-Moreno*, 265 F.3d 276, 288 (5th Cir. 2001) (internal marks and citations omitted).

This court has also said that an inability to follow instructions or a lack of candor may be a valid basis for dismissing a juror. *Ebron*, 683 F.3d at 127 (internal citations omitted). Stiger's counsel concedes that her trial counsel did not join the request to remove the juror. Thus, Stiger would have to meet the more stringent plain error standard and show an error, that is clear or obvious and which affects her substantial rights. Fed. R. Civ. P. 52(b); *see also Molina-Martinez v. United States*, 136 S.Ct. 1338, 1343 (2016); and *United States v. Olano*, 507 U.S. 725, 732-34 (1993)

During the trial when Roy's defense counsel was cross-examining Drews, a juror interrupted the proceedings to give the judge a note. The note stated: "We need to take a break for the judge. The judge is not alert. Lawyer is badgering witness. Thank you." The district court called a bench conference to discuss the note and ways of handling the situation. Defense counsel wanted to dismiss the juror as being prejudicial. The government wanted to ignore the note and move on. The court decided to conduct an in camera examination of the juror on the record. During this examination, the court said:

> Let me explain a couple things. The lawyer is asking questions, and they are tough questions. That does not mean she is being badgered. Nobody has made any objection.
> Now, as for you saying I am not alert, I am alert. You may have heard me say yesterday I had a doctor's appointment. The reason I had a doctor's appointment is I had surgery on my right eye. You may notice it is much redder than the other, and I was a little concerned because I thought it should be healing

6

faster, but the doctor said it is doing fine.  The vision is okay, and what it does at times is it becomes irritated, and I will close it at times because of that.  It is healing.

The juror said, "okay."  The court then continued:

> But just so you know, the witness—when tough questions are being asked or—or the lawyers are asking questions, all the lawyers are doing is trying to test the witness' recall, test how she investigated the case and so forth, okay.
>
> Now, if it gets out of line, if he is mistreating her, the lawyers are going to object or else I am going to step in.  It has not gotten to that point, but I appreciate you being concerned about me.

The juror replied, "That's all my intentions [sic].  That was my only intention."  The court said: "No, that's fine.  But anyway I am aware of what is going on and the questions have been tough, and I have shifted positions a couple of times."  The court also added, "[m]y eye is irritated, but it is not to the point that I need a break, but I appreciate your concern."  The juror again indicated that was her intention, and when asked if she had any questions, she said: "No, no.  I just wanted to make sure everything was fair on both sides."  The court then stated:

> Okay.  All right [sic], I will remind you once again your job is to be fair and impartial to both sides and listen to the evidence and keep an open mind, and at the conclusion of the case along with your fellow jurors make a decision as to whether the defendants are guilty or not guilty based upon what you have heard in the trial and in conjunction with my instructions; all right?

The juror replied, "Okay."  The examination concluded and the juror was instructed not to discuss anything that took place in chambers with the other jurors.

Defense counsel objected and asked that the juror be struck from the jury on the belief that she had formed an opinion and, thus, became disqualified.  Defense counsel also argued that, during the original voir dire, the court had made clear to the jurors that the court would control the proceedings and they were not to concern themselves with questions of law or proceedings.  Counsel also moved for a mistrial.  The court made a finding that it did not believe the juror had formed any bias at that point and denied the motions.

The appellants now assert that the district court abused its discretion by not removing the juror and seating an alternate.  Appellants particularly take issue with the fact that the juror became the presiding juror.  However, the mere fact that she became the presiding juror and signed the verdict form in no way established bias or that she somehow poisoned the proceedings.  The appellants also take issue with the juror being a health care administrator at a large hospital who had acknowledged that she had heard patients complain about home health care and that she was aware that physicians knew which HHAs they preferred and which they did not.  However, those facts were openly discussed during voir dire and not something discovered during trial evidencing any kind of bias or suddenly establishing good cause for dismissal.

The juror indicated to the court that she could be fair and impartial and follow the court's instructions.  There was nothing to indicate good cause for removal, a lack of candor, or that the note or discussion in camera established any specific bias.  The note appeared to be an isolated incident.  Thus, under the applicable standard set out above, the appellants are unable to establish an abuse of discretion, much less plain error in the case of Stiger.

No. 17-10665

## II. Whether the evidence was sufficient to convict Dr. Roy and Cynthia Stiger.

Roy and Stiger argue that there was insufficient evidence introduced at trial to support their respective convictions. We review a properly preserved challenge to the sufficiency of the evidence de novo, but we afford considerable deference to the jury's verdict. *United States v. Curtis*, 635 F.3d 704, 717-18 (5th Cir. 2011). We view the evidence in the light most favorable to the verdict, and we will affirm if any reasonable trier of fact could have found every element of the offense beyond a reasonable doubt. *Id.*; *see also United States v. Ford*, 558 F.3d 371, 375 (5th Cir.2009). "The jury retains the sole authority to weigh any conflicting evidence and to evaluate the credibility of the witnesses." *United States v. Grant*, 683 F.3d 639, 642 (5th Cir. 2012) (internal marks and citation omitted). "However, the government must do more than pile inference upon inference upon which to base a conspiracy charge." *Id.* (internal marks and citation omitted). Under this standard, the district court's denials of the motions for judgment of acquittal do not appear to be in error.

### *Roy – Counts 1, 2-11, 15-16, 17*

Roy asserts that the district court abused its discretion by denying the motion of acquittal because the defense established that there was no intent to defraud Medicare. Thus, Roy argues that he could not be convicted of conspiracy or Medicare fraud since the intent was the missing element for both charges. Specifically, Roy asserts that the factual determination of "homebound" is a medical opinion and a difference in opinion cannot establish an intent to commit fraud. Roy also asserts that none of the three agreements exposed by the prosecution were about defrauding Medicare. We disagree.

9

No. 17-10665

To establish a conspiracy to commit health care fraud, the government must prove beyond a reasonable doubt that (1) two or more individuals made an agreement to pursue the unlawful offense of fraud; (2) the defendant knew of the agreement; and (3) the defendant voluntarily participated. 18 U.S.C. §§ 1347, 1349; *United States v. Imo*, 739 F.3d 226, 235 (5th Cir. 2014). The agreement may be silent and informal. *Id.* Further, "voluntary participation may be inferred from a collection of circumstances, and knowledge may be inferred from surrounding circumstances." *Id.* (internal citation omitted).

For these purposes, "health care benefit program" is defined as "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract." 18 U.S.C. § 24(b).

The health care fraud statute states, in relevant part, that "[w]hoever knowingly and willfully executes, or attempts to execute, a scheme or artifice—(1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property" of any health care benefit program "in connection with the delivery of or payment for health care benefits, items, or services" commits health care fraud. 18 U.S.C. § 1347(a). Further, subsection (b) states that "[w]ith respect to violations of this section, a person need not have actual knowledge of this section or specific intent to commit a violation of this section." 18 U.S.C. § 1347(b).

Both conspiracy and health care fraud "require proof of knowledge and specific intent to defraud." *United States v. Willett*, 751 F.3d 335, 339 (5th Cir. 2014). "However, this proof may be inferred from circumstantial evidence. … Furthermore, a defendant need not have actually submitted the

No. 17-10665

fraudulent documentation … in order to be guilty of health care fraud or conspiracy to commit health care fraud." *Id.* (internal marks and citations omitted). The government does not have to prove that a defendant knew that the purpose of the agreement was an actual violation of a statute. The government must prove that the defendant knew the purpose of the agreement and must prove that the purpose was unlawful. *United States v. Brooks*, 681 F.3d 678, 699 (5th Cir. 2012). "Conspiracy actually has two intent elements—intent to further the unlawful purpose and the level of intent required for proving the underlying substantive offense." *Id.* However, these two intents "often functionally collapse into a single intent." *Id.* at n.16 (citing *United States v. Chagra*, 807 F.2d 398, 401 (5th Cir. 1986)).

The evidence introduced at trial established that Roy provided money for the operation of Apple in exchange for 50 percent of the profits. Roy's principal duty was to certify POCs. Stiger and Veasey retained 50 percent of Apple's profits because they were responsible for finding patients. Veasey recruited patients throughout the community, at times pretending to be a preacher. Stiger was Apple's administrator and would recruit patients throughout the community via word-of-mouth. Roy's employees testified that Roy did not always review the POCs before they signed his name to them, up to 100 a day, as he authorized them to do. This evidence was sufficient to establish the elements of conspiracy to commit health care fraud.

With regard to the substantive counts, the patient from Count 2 testified that she met Veasey while walking home from a dollar store. The patient for Count 3 testified he signed up for home health simply because his wife did. That patient's wife, from Count 4, testified that she signed up after Veasey came to the door dressed like a preacher and told her about home health. Despite the patient believing she would not qualify and the fact that she got around without any sign of immobility, Roy signed her POC. The patient from Count 7 was signed up by a co-conspirator not a party to this

11

appeal and her own physician testified she did not qualify for home health. The patient from Count 8 testified that he was spending days at The Bridge, a homeless shelter, when he was recruited by Eleda and certified for home health by Roy. The administrator from the shelter testified that individuals staying there had to be able to take care of themselves. That patient's POC falsely stated he had an amputation. The patient from Count 9 also stayed at The Bridge when he was recruited, and his POC falsely stated he was incontinent. The patient from Count 10 also stayed at The Bridge but would often take the train in the morning from Dallas to Fort Worth to go to the mall and go sightseeing. The doctor from the shelter's clinic testified that she would not qualify as homebound. The patient from Count 11 said Eleda recruited him and paid him for signing up. Roy certified him and his POC included false information about bowel and bladder complications.

Under 18 U.S.C. § 1035, an individual is guilty of making false statements related to health care matters when he "knowingly and willingly—(1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact; or (2) makes any materially false, fictitious, or fraudulent statements or representations, or makes or uses any materially false writing or document" containing such matters involving a health care benefit program. 18 U.S.C. § 1035(a).

Roy argues that there was no false statement because he "kept billing with his PIN number suspended and the other providers provided the medical care to the patients under their numbers with the new group." Also, Roy argues, "No false address or false information provided to Medicare. There was no evidence anywhere in the records that [he] was involved with the medical care for Count 15 and 16." Roy further asserts that he did not attempt to circumvent the suspension because he did not receive any money from Medicare.

No. 17-10665

After Medistat was suspended by Medicare, Roy created a new entity, Medcare HouseCalls, obtained a new billing identification number and continued billing Medicare for Medistat patients.  Those patients pertain to Counts 15 and 16.

The offense of obstruction, in this context, provides that an individual "with intent to avoid, evade, prevent, or obstruct compliance, in whole or in part," with an investigation who "willfully withholds, misrepresents, removes from any place, conceals, covers up, destroys, mutilates, alters, or by other means falsifies any documentary material, answers to written interrogatories, or oral testimony, which is the subject of such demand; or attempts to do so or solicits another to do so," commits the offense of obstruction. 18 U.S.C. § 1505. Obstruction may also be committed by threats or force. *Id*.

Roy asserts that there was no obstruction, as charged in Count 17. Further, Roy argues the government's witness, Scott Ward, testified that he stopped the audit because the OIG told him to, not because Roy obstructed the investigation.  Actually, Ward also said that they were unable to complete the audit in part because they were unable to access the records at Medcare HouseCalls.

The government charged Roy with obstruction based on the creation and use of Medcare HouseCalls to circumvent Medistat's suspension for fraud.  Special Agent Miranda Bennett provided testimony to support this offense.

A review of the record in this matter indicates that there was sufficient evidence to support Roy's convictions for conspiracy to commit health care fraud, health care fraud, false statements and obstruction.

No. 17-10665

*Stiger – Count 1*

Stiger asserts that the district court erred in failing to grant her motion for judgment of acquittal under Rule 29 because the evidence was insufficient to support a finding beyond a reasonable doubt on all three elements of conspiracy to commit health care fraud. *See* Fed. R. Crim. P. 29. Stiger asserts that, because she was indicted only for conspiracy and not for any substantive counts of fraud, the government's evidence did not sufficiently prove the element that she agreed to commit health care fraud. Stiger cites *United States v. Ganji*, 880 F.3d 760, 767-773 (5th Cir. 2018), for support.

In *Ganji*, this court reversed a doctor's conviction of conspiracy to commit health care fraud because the circumstantial evidence was insufficient to establish a concert of action to prove an agreement. *Id.* at 768-69. The court said, "when proving an agreement exists by using the concert of action theory, the Government must present evidence of the conspirators' individual actions that, taken together, evidence an agreement to commit an unlawful objective beyond a reasonable doubt." *Id.* This court concluded that witnesses admitted their own fraud but did not implicate Ganji. *Id.* at 770. Unlike Ganji, Stiger was indeed implicated.

Stiger asserts that the testimony from nurses who worked at Apple that Stiger overruled their decisions on whether to admit patients to home health care or discharge them, at most, shows a simple disagreement. However, this is essentially Stiger arguing that the jury should have believed her theory over the government's theory. That does not establish insufficiency of the evidence. Also, those nurses testified that Stiger was undermining their professional judgment and overriding their nursing decisions. Stiger also asserts that the testimony she reimbursed an employee who provided groceries, pest control services, or payment of utility bills to patients who needed those services indicated she just wanted patients to have

those services, which she claims would be medically necessary, and not that she sought reimbursement of those amounts from Medicare. Further, Stiger asserts that the agreement between Roy, Veasey and herself to provide funds for the operation of Apple was a legitimate loan.

Stiger also argues that, regardless of whether there was a discussion about "ping-ponging," James Aston admitted that no patients were ping-ponged between his agency and Stiger's agency. Aston was a former employee of Roy who eventually opened his own HHA, Provider Texas Home Health, with a loan from Roy. Aston testified about attending a conference with Roy and Stiger and a discussion about bouncing patients back and forth between Provider Texas and Apple so that patients could continue receiving services. While Aston did admit that there was no "ping-ponging" between Provider Texas, which only operated for six months serving Roy's patients and never became certified, and Apple, he did not state that there was no "ping-ponging" between Apple and any other HHAs. Moreover, the fact that it did not happen with Provider Texas in no way establishes that the agreement or discussion did not exist.

The record in this matter likewise establishes that the evidence was sufficient to support Stiger's conviction for conspiracy to commit health care fraud.

### III. Whether Roy can establish prosecutorial misconduct.

We review unpreserved claims of prosecutorial misconduct for plain error, i.e., Roy must show an error that is plain and that affects his substantial rights. *United States v. Bennett*, 874 F.3d 236, 247-48. If Roy is able to do so, then "we may exercise our discretion to correct the error if it seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (internal marks omitted).

Roy asserts multiple claims of prosecutorial misconduct, including whether: (A) the prosecution knew or should have known that the testimony of co-conspirator Cyprian Akamnonu, who is not part of this appeal, was perjured and was material; (B) the failure to produce in evidence the content of the Lytec program constituted a due process violation and legal prejudice; (C) the prosecution violated Roy's right to due process by creating deceptions to mislead the jury; and (D) the prosecution improperly argued burden shifting at closing.

Specifically, Roy argues that Akamnonu lied when he testified that he never forged Roy's signature.  However, Roy argued this claim at trial and unsuccessfully tried to convince the jury that Roy did not sign the POCs with regard to Ultimate, the HHA with which Akamnonu was affiliated.  The mere fact that this strategy did not work does not establish perjury, reversible error or prosecutorial misconduct.  Roy also asserts that the government knew or should have known that HHAs could bill and get paid by Medicare without a signed POC.  Roy is referencing Akamnonu's statement that "[i]f he doesn't sign the 485, then [Ultimate] can't bill" Medicare.  Roy argues that the defense proved Ultimate did get paid without a signed 485.  However, the testimony Roy references established that Ultimate was able to see a patient and bill Medicare without a signed 485, not that Ultimate received payment in full from Medicare for that patient.  Roy fails to establish that the prosecution "brainwashed" the jury into believing any knowingly false statements or perjury.

Roy next asserts that the government failed to introduce into evidence the content of the Lytec program, the medical practice management software and database used by Roy's practice.  Miranda Bennett, a special agent with HHS-OIG, and Drews testified that they imaged Medistat's computers containing the Lytec program and data.  Roy argues the seized evidence was not opened and not analyzed because the government did not have a license

to use the software.  Actually, the testimony was that the government imaged the data, but could not utilize it in the same way as Medistat because the government did not have a license for the software.  Moreover, Roy fails to cite any authority establishing that the government had a duty to introduce the Lytec data.  Additionally, Roy had the Lytec data and could have introduced it himself.  Thus, again Roy fails to establish error.

Roy next argues that the government "created deceptions, conviction traps, cunning play on words to incite the convictions by depicting the jury's decision toward a seeming obvious choice in favor of the prosecution by corrupting the facts and subverting the proceedings."  He then points to various statements that he takes issue with and claims are deceptions.  But the record does not support his claims and he fails to establish error.

Finally, Roy argues that prosecutorial misconduct is established through the burden shifting during closing argument when the government referenced the fact that all of its medical professionals testified that the patients at issue were not homebound.  Roy claims that statement improperly shifted the burden onto him to present a witness to establish the patients were homebound.  He is mistaken.  The government was summing up the evidence it had presented.  Again, he fails to establish error.

For these reasons, Roy is unable to establish plain error on his claims of prosecutorial misconduct.

## IV. Whether Roy can show plain error of constructive amendment to the indictment.

Roy failed to preserve this claim, so we review for plain error.  *United States v. McGilberry*, 480 F.3d 326, 331 (5th Cir. 2007).  Roy asserts that the government was allowed to constructively amend the indictment by inciting and compelling the jury to convict him for Medicare fraud because he was

not reviewing the POCs, which was not included as an element of fraud in the indictment.

A broadening of the indictment can be explicit, implicit or constructive. *United States v. Doucet*, 994 F.2d 169, 172 (5th Cir. 1993). "To be a constructive amendment, a jury charge must permit the jury 'to convict on an alternative basis permitted by the statute but not charged in the indictment.'" *United States v. Griffin*, 800 F.3d 198, 202 (5th Cir. 2015). "A constructive amendment occurs when it permits the defendant to be convicted upon a factual basis that effectively modifies an essential element of the offense charged or permits the government to convict the defendant on a materially different theory or set of facts than that with which [he] was charged." *United States v. McMillan*, 600 F.3d 434, 451 (5th Cir. 2010) (internal quotations and citations omitted).

The indictment charged Roy with billing for services he did not perform, and that was established by the evidence. Roy fails to even allege anything that would constitute an amendment of the indictment or that modified any element of the offense charged. He, again, merely takes issue with some of the evidence introduced at trial. Roy was not convicted "on a materially different theory or set of facts than that with which [he] was charged." *Id.* Because we find no plain error, this issue is without merit.

## V. Whether the district court erred or abused its discretion with regard to jury instructions.

Roy asserts that the trial court erred by including civil regulations in the jury instructions and abused its discretion by failing to give his requested limiting instruction. Specifically, Roy argues that the inclusion of the definition of "homebound" from the Medicare regulation "poisoned the proceedings" by causing the jury to focus on the civil regulations rather than the criminal statute. Further, he argues that the court abused its discretion

by denying his requested instruction referencing *United States v. Christo*, 614 F.2d 486, 490-92 (5th Cir. 1980).

We review a court's failure to give a limiting instruction for an abuse of discretion. *Imo*, 609 F.3d at 233. Further:

> Reversal is proper only if the requested instruction (1) was a substantially correct statement of the law, (2) was not substantially covered in the charge as a whole, and (3) concerned an important point in the trial such that the failure to instruct the jury on the issue seriously impaired the defendant's ability to present a given defense.

*Id.* (internal citation and marks omitted).

Roy sought the following jury instruction: "Any violations of a civil Medicare or Medicaid regulation, if such violations indeed occurred, are not considered criminal offenses. You are only to decide whether the government has proved beyond a reasonable doubt that the Defendant committed a criminal offense charged in the indictment."

Roy argues that, like in *Christo*, the civil standards were equated with the criminal standards by the inclusion of the definition from the Medicare regulations. However, Roy admits that the holding in *Christo* was "that the government may not prove a criminal case violation of federal banking law solely by proving a violation of a civil banking regulation." (Roy Br. at 31). In *Christo*, the government's case centered on violations of a regulatory banking statute. 614 F.2d at 489. Here, unlike *Christo*, the government did not attempt to prove a criminal violation solely by proving a violation of a civil regulation.

Additionally, a review of the instruction regarding "homebound" indicates that it provided clarity and in no way indicates that it would have caused the jurors to focus on the civil regulations rather than the crimes alleged. In fact, portions of the "homebound" discussion clearly aided Roy

by explaining that patients can still be considered homebound even if they are able to and do leave home periodically for various reasons. Further, the instructions as a whole clearly instructed jurors to consider only the crimes charged and fully explained the elements the government must prove beyond a reasonable doubt. This court found no abuse of discretion in *Imo*, 739 F.3d at 233-34, for these same reasons.

Thus, this claim is without merit.

## VI. Whether the district court plainly erred when it allowed lay testimony from witnesses regarding the Medicare program.

This court typically reviews rulings on the admission of lay person and expert testimony for an abuse of discretion. However, as this claim is unpreserved, we review for plain error. *See United States v. Caldwell*, 586 F.3d 338, 341 (5th Cir. 2009).

Roy asserts that the district court committed plain error by allowing lay witnesses to offer testimony expressing a flawed interpretation of "homebound" in contradiction to the Medicare regulation which required the requisite knowledge and in violation of Rules 701 and 702 of the Federal Rules of Evidence. Rule 701 states:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
> (a) rationally based on the witness's perception;
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
> (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701.

This court has said that "[t]he distinction between lay and expert witness testimony is that lay testimony results from a process of reasoning

familiar in everyday life, while expert testimony results from a process of reasoning which can be mastered only by specialists in the field." *Ebron*, 683 F.3d at 136-37 (internal marks and citations omitted).

Roy first cites the "false narrative scripted by the prosecution" in the government's opening statement. That, of course, is not testimony. Then Roy cites to the testimony of various doctors of specific patients whom Roy had certified for home health, including: (1) Dr. Muhammad Nasir, who described his understanding of homebound as "[b]asically, the patient is homebound status where they cannot come to visit their primary care physician in the clinic . . ."; (2) Dr. Michael Muncy, who did not recall specifics of a particular patient without referring to the medical record and said he was not particularly familiar with the details of the requirements for someone to be certified for home health care; (3) Dr. Minaj Kahn, who said he did not prescribe home health to a specific patient in 2011 because he did not believe the patient qualified for it; and (4) Dr. Cornelia Tan, who said that she did not consider a specific patient to be homebound.[4]

However, in each instance, defense counsel was able to do extensive cross-examination to clarify any definitions, to point out that witness' unfamiliarity with the regulation, have the witness read the actual regulation and recite what it says, specify time periods, and correct any possible confusion that Roy believes may have resulted from any testimony. Moreover, Roy fails to point to any testimony from any of these witnesses claiming to be an expert on Medicare regulations. Additionally, as previously discussed, the relevant Medicare regulations were provided to the jury.

---

[4] The government's briefed response to this discusses two other witnesses, Mark Porter and Lisa Garcia, who testified generally regarding the Medicare program guidelines and processes. The government provided pretrial notice of its intent to call these two witnesses. However, it does not appear that Roy is taking issue with these witnesses.

No. 17-10665

For these reasons, Roy is unable to establish plain error.

**VII. Whether the district court erred in determining the loss amount; whether the district court erred in applying the four-point enhancement under U.S.S.G. § 2B1.1(b)(7)(iii) to Veasey; and whether the sentences were procedurally and substantively unreasonable.**

Veasey asserts that his sentence is based upon an erroneous loss calculation of $23,630,377.26. Roy asserts that his sentence was based upon an erroneous loss calculation of $268,147,699.15.

We review the district court's finding regarding the amount of loss for clear error, but we review the district court's method for determining that amount de novo. *United States v. Harris*, 821 F.3d 589, 601 (5th Cir. 2016). The district court need only make "a reasonable estimate of the loss," based on its assessment of the evidence and its "loss determination is entitled to appropriate deference." *United States v. Hebron*, 684 F.3d 554, 560 (5th Cir. 2012); U.S.S.G. § 2B1.1, cmt. 3(C). We will not overturn these factual findings as long as they are "plausible in light of the record as a whole." *United States v. Sanders*, 343 F.3d 511, 520 (5th Cir. 2003).

For purposes of the guidelines, "loss is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A). Actual loss "means the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* cmt. n.3(A)(i). Intended loss, on the other hand, "means the pecuniary harm that the defendant purposely sought to inflict." *Id.* cmt. n.3(A)(ii).

We review the district court's interpretation and application of the Guidelines de novo and its factual findings for clear error. *United States v. Trujillo*, 502 F.3d 353, 356 (5th Cir. 2007). We review an appellant's claim that a sentence is substantively unreasonable for an abuse of discretion. *United States v. Scott*, 654 F.3d 552, 555 (5th Cir. 2011); *see also Gall v. United*

22

*States*, 552 U.S. 38, 51 (2007).  This review is "highly deferential, because the sentencing court is in a better position to find facts and judge their import under the § 3553(a) factors with respect to a particular defendant." *Scott* 654 F.3d at 555.

A sentence within the Guidelines range is presumptively reasonable, and this presumption is rebutted only if the appellant demonstrates that the sentence does not account for a factor that should receive significant weight, gives significant weight to an irrelevant or improper factor, or represents a clear error of judgment in balancing sentencing factors.  *United States v. Cooks*, 589 F.3d 173, 186 (5th Cir. 2009).

With Veasey, the district court adopted the loss calculation in ¶ 30 of the PSR of $23,630,377.26.   This put Veasey under U.S.S.G. § 2B1.1(b)(1)(K) and required an increase of 20 because the loss was over $9,500,000 and less than $25,000,000.

Veasey asserts that, according to the PSR, there were only three specific claims that Apple billed fraudulently for $2,996.74, $1,815.27 and $1,196.74, totaling $6,009.22 for those three patients.  Thus, because the loss is under $6,500, Veasey argues that there should be no increase under U.S.S.G. § 2B1.1(b)(1)(A).

Veasey then makes an alternative argument based on his admission that ¶ 30 of his PSR states that Apple billed Medicare $9,282,690.07 and Medistat billed Medicare $1,088,495.74 on behalf of Apple's patients. Veasey argues that Apple was paid only $8,753,055.84 in fraudulent claims, and Roy was paid $631,064.78 in fraudulent claims by Apple.  Veasey asserts the court should combine those two amounts for a loss calculation of $9,384,120.62, which would fall under U.S.S.G. § 2B1.1(b)(1)(J) and require an 18-level increase if the loss is more than $2,500,000 but less than $9,500,000.  U.S.S.G. § 2B1.1(b)(1)(J).

Veasey's assertions fail to take into account the additional $14,246,656.64 Medistat received pursuant to this conspiracy. Veasey relies on Bennett's testimony that he was not present during the "ping-pong" discussion. However, that was only a minor part of the entire conspiracy with which Veasey was involved. Further, other evidence indicates that Veasey was aware of the "ping-pong" plan.

Veasey is unable to establish that the district court's estimate of the loss was unreasonable. *Hebron*, 684 F.3d at 560. Further, the district court's findings are plausible in light of the record as a whole. *Sanders*, 343 F.3d 520. For these reasons, the district court did not err.

Veasey also asserts that the district court erred by applying the four-point enhancement under U.S.S.G. § 2B1.1(b)(7)(iii), which states: "If (A) the defendant was convicted of a Federal health care offense involving a Government health care program; and (B) the loss under subsection (b)(1) to the Government health care program was . . . (iii) more than $20,000,000, increase by 4 levels." U.S.S.G. § 2B1.1(b)(7)(iii). Because the district court did not err in its calculation of loss, Veasey is likewise unable to establish error on this issue.

Veasey's argument that his sentence was procedurally or substantively unreasonable is based solely on his argument that the loss calculation was erroneous. He is unable to establish any error or abuse of discretion.

Roy asserts that his "sentence was procedurally unreasonable due to error in calculation of actual and intended loss based on false and unreliable information in the PSR relating the amount of Medicare billings reported by the HHAs relevant to Dr. Roy's certifications which was false, large amount was not relevant to Dr. Roy." Roy appears to be arguing that he was not

aware of what the HHAs were doing. However, the record does not support that claim.

Further, Roy asserts that "[i]t was clear error in calculation of the actual loss and the intended loss amount based on all the certifications from Dr. Roy were fraudulent due to the creation of the 485 department and the POCs were not reviewed and signed by Dr. Roy." Roy then basically argues that the evidence presented at trial was false, that the services and tests he provided were medically necessary, that not all of the patients were not homebound, that the fact that the government dismissed Count 5 and he was acquitted of Count 6 indicate a finding that across-the-board fraud cannot be sustained in this case, and takes particular issue with the Ultimate certifications being considered relevant to him. However, again, the record does not support this.

Accordingly, these issues are without merit.

## VIII. Whether Roy, Stiger and Veasey can show error in the district court's restitution awards.

We review preserved error as to the quantum of an award of restitution for abuse of discretion. *United States v. Sharma*, 703 F.3d 318, 322 (5th Cir. 2012). Absent an objection, we review for plain error. *United States v. De Leon*, 728 F.3d 500, 507 (5th Cir. 2013). A district court's factual findings are reviewed for clear error. *Sharma* 703 F.3d at 322. "A factual finding is clearly erroneous only if based on the record as a whole, we are left with the definite and firm conviction that a mistake has been committed." *Id.* (internal marks and citation omitted). "We may affirm in the absence of express findings if the record provides an adequate basis to support the restitution order." *Id.* (internal marks and citation omitted).

Under the MVRA, the district court is required to award restitution to victims "directly and proximately harmed" by a defendant's offense, as

long as the court does not award a windfall greater than the victim's actual loss. *De Leon*, 728 F.3d at 506. "The government has the burden of proving a victim's actual losses." *Id.*

Roy asserts that the district court abused its discretion by assessing restitution in the amount of $268,147,699.15 "[f]or the same reason the court's loss calculation was erroneous, its restitution order also was erroneous including amounts not relevant to Dr. Roy for the actual loss." Roy was unable to establish error in loss calculation and is unable to establish an abuse of discretion here.

Veasey also asserts the same arguments here as he did for the loss calculation. For the same reasons those arguments failed there, Veasey is unable to establish an abuse of discretion or clear error here.

Stiger asserts that the district court clearly erred by not reducing her restitution by 50 percent based on Dupon's testimony that 50 percent of Apple patients during her tenure were qualified for home health care.[5] Accordingly, Stiger asserts that her restitution amount should have been reduced from $23,630,777.26 to $11,815,388.63.

During trial, Dupon was asked: "Looking back at your time at Apple, can you give a reasonable approximation of the number of patients that qualified for Medicare home health care?" Dupon replied: "About 50. 50 percent." That brief mention of her belief as to an approximate number is hardly sufficient to rebut the evidence of loss presented at trial, or to establish clear error or an abuse of discretion.

---

[5] Stiger mentions that counsel's objection to the PSR may have been based on the fact that she was co-owner of Apple with Veasey. While Stiger does not argue that now, it would likewise fail to establish clear error or an abuse of discretion.

Stiger also asserts that she should not be held jointly and severally liable for restitution incurred by other defendants unrelated to Apple based upon *Honeycutt v. United States*, 137 S.Ct. 1626 (2017). Stiger concedes that *Honeycutt* applied only to forfeiture. But Stiger states that she is raising the issue in the event *Honeycutt* is applied to restitution during the pendency of this appeal, for such a ruling by this court, or to preserve it for possible Supreme Court review. We decline to apply *Honeycutt* here. Not only did *Honeycutt* have to do with forfeiture, it had to do with forfeiture of substitute property when the tainted property itself was not available. *Id*. at 1634-35. That is nothing like restitution, which has to do with actual loss. Further, *Honeycutt* did not alter or overrule liability under *Pinkerton v. United States*, 328 U.S. 640 (1946). In fact, in response to the government's argument that Congress must be presumed to have legislated against the background principles of conspiracy liability, the Supreme Court said that the "plain text and structure" of the statute in question "leave no doubt that Congress did not incorporate those background principles." *Honeycutt*, 137 S.Ct. at 1634.

For these reasons, we find no error.

## IX. Whether Stiger and Eleda can establish that Standard Condition of Supervised Release No. 6 is unreasonably broad.

Stiger and Eleda both assert that one of the conditions of their supervised release is unreasonably broad. The condition at issue here, Standard Condition of Supervised Release No. 6, states: "You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view."

In *United States v. Duke*, 788 F.3d 392, 398 (5th Cir. 2015), this court said:

No. 17-10665

A district court has wide, but not unfettered, discretion in imposing terms and conditions of supervised release. A district court's discretion is curtailed by statute in two ways. First, the condition of supervised release must be reasonably related to one of four statutory factors: (1) the nature and characteristics of the offense and the history and characteristics of the defendant; (2) the need for deterrence of criminal conduct; (3) the need to protect the public from further crimes of the defendant; and (4) the need to provide the defendant with vocational training, medical care, or other correctional treatment. Second, the condition must be narrowly tailored such that it does not involve a greater deprivation of liberty than is reasonably necessary to fulfill the purposes set forth in [18 U.S.C.] 3553(a). Moreover, the sentence should consider the policy statements issued by the Sentencing Commission.

*Id*. at 398 (internal marks and citations omitted); *see also* 18 U.S.C. § 3583. Neither Eleda nor Stiger objected, thus review is for plain error.

This court recently concluded that a district court did not abuse its discretion by imposing that very condition. *See United States v. Payton*, 959 F.3d 654, 656, 658 (5th Cir. 2020). Thus, Eleda and Stiger are unable to establish error, plain or otherwise.

## X. Whether Roy can establish cumulative error.

Roy asserts that if the court does not find that reversal is warranted on other grounds, then the cumulative effect of all of the errors at trial warrant a new trial. Roy cites *United States v. Eghobor*, 812 F.3d 352 (5th Cir. 2015), as support. In *Eghobor*, we said: "The cumulative error doctrine provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." *Id*. at 361. As there are no plain or harmless errors here, there can be no cumulative error.

No. 17-10665

## CONCLUSION

For these reasons, we AFFIRM the judgments in the district court as to all appellants.